Filed 11/16/15  P. v. Barbarin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES BARBARIN,<br><br>    Defendant and Appellant. | D068066<br><br><br>(Super. Ct. No. RIF1203746) |

APPEAL from a judgment of the Superior Court of Riverside, Christian F. Thierbach, Judge.  Affirmed.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant James Barbarin (Appellant) was 16 years old when he was convicted by a jury of the attempted murder of Tony Adame, who was known in Appellant's

community as a dropout from a gang of which some of Appellant's family were members. (Pen. Code, §§ 664/187, subd. (a); all further statutory references are to this code unless noted.) The jury found true the charged enhancements, that Appellant personally used a firearm and inflicted great bodily injury upon the victim (§ 12022.53, subd. (d); § 12022.7, subd. (a); § 1192.7, subd. (c)(8)), and that the crime was committed for the benefit of a gang. (§ 186.22, subd. (b).)

The trial court sentenced Appellant to 40 years to life in prison, consisting of 15 years to life as the sentence for attempted murder, and a consecutive sentence of 25 years to life for personal discharge of a firearm causing great bodily injury, in the commission of a gang-related offense. (§ 186.22, subd. (b)(5); § 12022.53, subd. (d).) The enhancement under section 12022.7 was stricken. (§§ 12022.53, subd. (f), 1170.1, subd. (g).) He appeals.

We first address Appellant's argument that no substantial evidence supports his conviction for attempted murder because, in his view, Adame's testimony was "inherently incredible" and improbable, due to conflicts in different accounts he gave about the events surrounding the shooting, and because a prosecution witness, in rebuttal, did not support parts of Adame's testimony. As we will explain, the jury heard Adame's eyewitness identification of Appellant as the person who shot him five times in the back and leg, and who kept clicking the gun as he tried to shoot him in the head. Adame testified that he was familiar with Appellant's family, many of whom were members of the East Side Riva (ESR) gang that he left. Adame only knew Appellant as "Happy." Despite some inconsistencies in Adame's and others' accounts of the events, overall, our

2

review of the record persuades us that Appellant's attempted murder conviction is sufficiently supported by the evidence.

We then turn to Appellant's arguments that his lengthy sentence is in violation of constitutional protections against cruel and unusual punishment, because it arguably amounts to a de facto sentence of life without possibility of parole ("LWOP") that was imposed on him for a crime committed when he was 15 years of age. (U.S. Const., 8th Amend.; *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*).) He further claims the trial court had the discretion to consider relevant factors concerning his age, as outlined in *Miller,* but it failed to do so. He alternatively contends he was deprived of equal protection of the law, since there is a statutory procedure applicable to most juveniles sentenced to LWOP, allowing them to seek recall of their sentences and resentencing pursuant to section 1170, subdivision (d)(2)(A)(i). He argues he is similarly situated to them and should receive the benefits of that provision.

We are mindful that many issues concerning juvenile sentencing in light of constitutional prohibitions of cruel or unusual punishment are now before the California Supreme Court in a number of cases, including *In re Alatriste* (review granted Feb. 19, 2014, S214652), *In re Bonilla* (review granted Feb. 19, 2014, S214960), and *People v. Franklin* (review granted June 11, 2014, S217699).[1] We apply existing law and

---

[1]    The Supreme Court order granting review identifies these juvenile sentencing issues currently before it: "(1) Did [section 3051], which includes provisions for a parole suitability hearing after a maximum of 25 years for most juvenile offenders serving life sentences, render moot any claim that such a sentence violates the Eighth Amendment to the federal Constitution and that the petitioner is entitled to a new sentencing hearing

3

conclude that Appellant did not receive a de facto life sentence, because he has not been denied an opportunity to seek release on parole within a meaningful portion of his natural lifetime. (§ 3051, subd. (b)(3) [parole suitability hearing allowed for juvenile offender sentenced to 25 years to life term, after 25 years have been served]; § 2933.1 [work time credits affect timing of prisoner's entitlement to a parole hearing].) Eighth Amendment prohibitions were not triggered, the sentence is not constitutionally defective and we affirm the judgment.

I

*SUBSTANTIAL EVIDENCE CLAIM*

A. Standards of Review

Appellant's main defense at trial was a lack of confirming identification of him, as the assailant, by a third party. ESR, a branch of the Mexican Mafia or Sureno, has numerous members in Riverside, including family members of Appellant to whom he bears a resemblance. Appellant points out that many gang members presumably had a motive to shoot Adame, since a decision to drop out of a gang is the type of act that exacts retaliation in that culture. Appellant argues that Adame, a convicted felon, was

applying the mitigating factors for such juvenile offenders set forth in *Miller* [132 S.Ct. 2455]? If not: (2) Does *Miller* apply retroactively on habeas corpus to a prisoner who was a juvenile at the time of the commitment offense and who is presently serving a sentence that is the functional equivalent of life without the possibility of parole? (3) Is a total term of imprisonment of 77 years to life (Alatriste) or 50 years to life (Bonilla) for murder committed by a 16-year-old offender the functional equivalent of life without possibility of parole by denying the offender a meaningful opportunity for release on parole? (4) If so, does the sentence violate the Eighth Amendment absent consideration of the mitigating factors for juvenile offenders set forth in *Miller*?" (*In re Alatriste*, order granting review Feb. 19, 2014, S214652; *In re Bonilla*, review granted Feb. 19, 2014, S214960 [referred to here as *Alatriste et al.*].)

4

extremely unreliable as a witness in identifying the perpetrator, so his testimony cannot amount to substantial evidence in support of the judgment. The trial court acknowledged at sentencing that Adame "is not on the Chamber of Commerce man of the year finalist list." Appellant also claims Adame had developed such a bias and desire for revenge that he would likely have blamed anyone who might be associated with the ESR gang, however unfair or inaccurate it might be for him to do so.

In reviewing such claims of insufficient evidence to support a conviction, we apply familiar substantial evidence standards of review. We review the entire record in the light most favorable to the trial court decision, drawing all reasonable inferences in favor of the trial court decision. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) To the extent that an appellant seeks to reargue the evidence on appeal, the reviewing court is not authorized to reassess the credibility of the witnesses. (*People v. Thompson* (2010) 49 Cal.4th 79, 124-125 (*Thompson*).) We determine whether there is substantial evidence in the record from which a reasonable jury could find each element of the offense to have been proved beyond a reasonable doubt. (*Zamudio*, *supra*, at p. 357.)

Even where an alternative theory of events was argued to the jury, if " ' "the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) A jury is best able to evaluate inconsistencies in testimony, in order to determine which facts have been shown to be true. (See *People v. Barnes* (1986) 42 Cal.3d 284,

5

306; see *People v. Mincey* (1992) 2 Cal.4th 408, 444.) A single witness's testimony may be sufficient to support a conviction unless it must be rejected because the events described were impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) A defendant may not reargue the evidence on appeal, and we do not reassess witness credibility. (*Thompson, supra,* 49 Cal.4th at pp. 124-125.)

### B. Background Information about Appellant and Adame

In 2013, Appellant lived in Riverside with his father Manuel Barbarin and other relatives, some of whom were members of ESR. For a few years before the shooting, Appellant was in the habit of socializing at a local park that was an ESR gang hangout, and he admitted to police officers who asked him that he was a gang member. Field investigation cards from 2011-2013 indicated Appellant sometimes wore gang-type clothing (distinctive belt buckle/baggy, large dark clothing), and officers believed he was affiliated with a gang, based on his companionship with known ESR gang members. Appellant spent time with his younger cousin, Isaac Sanchez, who was related to him on his Hispanic mother's side. Appellant also hung out with his older half-brother Daniel Valadez, who had a different father, a Black man.

Adame, age 44 at the time of the shooting, went to school with Appellant's father and uncles. For some time, Adame was a fellow ESR member with Appellant's relatives. Adame began his gang involvement as a young teenager, and until around 2005, he was an active "soldier" in ESR's 14th Street clique. Adame served prison terms for felonies beginning in 1991 (shooting at an occupied vehicle), in 1995 (robbery), and in 2005

6

(transporting controlled substance). While active in the gang, he also committed numerous other offenses for which he was not charged.

During his prison sentence for the 2005 drug conviction, Adame decided to drop out of ESR, feeling he "was getting older," and some of its younger members did not appear to have discipline and focus. He also left in recognition of the needs of his wife and young children. He began the "debriefing" process by contacting prison authorities. He was placed in solitary confinement and then protective custody (PC) in the sensitive needs yard, in compliance with the prison's safety protocol for protecting dropouts. Later, Adame was paroled, but he did not report to his parole officer and was returned to prison. He was again paroled in December 2011.

Adame knew that in ESR culture, dropouts like him are considered "dead" or "dead [men] walking." Although he realized he would be in danger of gang retaliation in ESR territory, he moved to the home of his 83-year-old grandmother, located there. He had separated from his wife and felt that his grandmother's house was the only place he could call home, and also, she could use his help. He had a job and was avoiding drugs due to drug testing requirements at work. He socialized with other dropouts at times, even though that was against gang protocol.

It was not unusual for Adame, whose background was known in the neighborhood, to be attacked, cursed and called names by ESR gang members. A bystander would call him a dropout or say things like "Hey, PC" (referring to his protective custody status in prison). One day, he was going to the store when someone fired a gun at him and hit his car. Sometimes, when gang members tried to "jump" and attack him, he was able to

7

"spank them" or beat them up, protecting himself. He had seen Appellant's family members around in the neighborhood, but he did not know Appellant personally. Adame thought that the Barbarin family members looked distinctive, "like Eskimos."

Adame was aware that ESR members have a serious rivalry with a local black gang, and he was surprised when he saw people of African-American descent in ESR neighborhoods. Valadez appeared to him to be such a person.

### C. Events of Shooting

At trial, Adame testified that on September 4, 2013, he went home from work around 5:00 p.m.-6:00 p.m. and found other family members at the house. Relaxing for the upcoming weekend, he was sitting on the porch drinking beer when his friend Jesse Rodriguez dropped by. Adame left his beer with Rodriguez and went to clean his work tools in the back of his truck. He noticed Rodriguez talking to several young men, including Appellant, near the side of the house. He heard someone in the crowd call him "PC," so he cursed back at the men, yelling, "What's up? You want some?"

Appellant's half-brother Valadez testified for the defense that he, Appellant, and Sanchez were visiting with Rodriguez at Adame's house, when Adame came up and started trying to go through Sanchez's pockets. Valadez objected, saying that Adame was older and bigger than Sanchez, and Adame responded by taunting him about looking like a black man and calling him racial slurs. Suddenly, Adame punched Valadez and people started gathering. Valadez said at trial that he was not sure whether Adame might have been reaching toward a weapon at his belt line. Sanchez got scared and wanted to leave, and he and his companions left.

8

Adame asked Rodriguez who had been cursing at him, and Rodriguez told him one of the young men was Appellant, called "Happy," a member of the Barbarin family. Rodriguez said another of them was Valadez, Appellant's half-brother. When Adame started drinking his beer again, he noticed that it tasted like methamphetamine. He told Rodriguez that he was "not cool with that," since he was regularly tested for drugs at work and was not using them. Adame started walking to the store to replace the beer, but the record is not clear whether Rodriguez went with him. Adame testified that he did, but Rodriguez testified that he did not remember much of what happened that day. Eventually, Rodriguez got a call and left the area.

Around 9:30 p.m., Adame continued walking home, drinking a beer and talking to his wife on his cell phone. He took a shortcut through a vacant house, toward a neighbor's breezeway, since it was a quicker way to go and then, he "[didn't] have to see any of the other guys from east side." He looked up and saw Appellant next to him with a gun, "with [his] eyes close up right in front of me." As they stood face to face, Appellant pointed his gun at Adame's head and said, "I got you. That's it, PC. What's up?" Appellant pulled Adame down the breezeway.

Adame suddenly began to run away, and Appellant shot him with a .22-caliber handgun. Adame fell to the ground, staring at Appellant who was still shooting. Adame "just felt like [he] was just floating in the air," felt a burning sensation, and cursed and yelled at Appellant. Appellant held his gun close to Adame's face and head, clicking and clicking, but the gun "didn't go" (misfired or no bullets left). Adame heard Appellant curse and flee.

9

Adame could not feel his legs and thought he was dying. He dragged himself toward a hiding place in some bushes and found his cell phone, but discovered the screen was cracked and not usable. The phone's redial feature worked and he called home, and told his father what happened. Rushing out, his father called 911 and told the dispatcher when and where he found Adame, who was bleeding heavily. While they waited for paramedics, the 911 dispatcher told Adame's father to ask him whether he knew who shot him. Adame's father repeated to her what Adame told him: "Some guy named Happy, something like that."

Another witness next door heard gunshots and cursing, and also called 911 at 9:30 that evening. When police officers and paramedics arrived at the scene, Adame told an officer that he was shot by "Happy," who was part of the Barbarin family. He did not know Appellant's first name, but described him as a 15-to 17-year-old light-skinned Hispanic male, about 5'10" tall and 180 pounds, wearing all black clothing. Adame was still bleeding while he told officers that "Happy" probably lived in the Barbarins' house on the corner of 11th and Victoria Avenue. He also said that "Happy" made him snort a line of white powder before the shooting.

### D. Investigation and Trial

At the scene, investigators found four used .22-caliber casings, a partly empty beer bottle, and bloodshed all around. The day after the shooting, Adame was interviewed at the hospital, where a detective showed him a set of six photographs that included Appellant's high school picture. Adame identified Appellant in the third photo as his attacker. He told the detective that he got into an argument and fistfight with Valadez by

10

asking him about his parents and which one of them was black, explaining to the detectives that he believed it was a "no-no" in the neighborhood (or "shameful") for different races to associate in that way.

Medical evidence showed that Adame had multiple gunshot wounds to his left arm, left leg, and back. One bullet went through his chest and hit his diaphragm, spine, and abdomen. Doctors inserted a titanium plate along his femur, and he is paralyzed from the waist down.

At trial, a gang detective testified that one of his sources told him that Appellant was called "Happy," or "Big Happy." Graffiti by that name was found in local parks in gang territory. A gang expert explained to the jury that one way for a young gang member to earn respect from the gang is to assist in enforcing its rules, by violently targeting its enemies. Of about 500 documented ESR members, about 100 are out and about in the neighborhood at a given time.

Adame knew he was risking his life by testifying at trial, and that "snitching" in any way made him a bigger target to the gang. He spoke up because "I thought I was dying, and I wanted my family to know who done it, because if I would have died, there would have been something else happen." When asked who shot him, he said it was Appellant, and "I will never forget that face, never."

Adame told the jury that he did not call Valadez names or ask him who his father was, although he admitted yelling at the three young men that day. He felt surprised to see Valadez in the neighborhood, due to his non-Hispanic appearance. It was only after the men started to yell at him and call him PC that Adame offered to fight them, and then

11

they left. Adame testified he must have been hallucinating when he told police after the shooting that he had just had an angry argument with Valadez. He admitted that "Happy" did not make him snort a line of drugs, and said he was hallucinating when he said that to police at the scene.[2]

In the defense case, Valadez testified that Adame called him a "nigger," but he managed to stay calm, which made Adame even madder. During the scuffle, he saw Adame reach for what could have been a weapon at his belt line. However, Valadez denied seeing Adame carrying a gun. Tapes from Valadez's interview with police after the shooting were then played for the jury, in which Valadez was heard to say he was 100 percent sure that Adame had a black gun during their confrontation.

Rodriguez was subpoenaed and testified as a rebuttal witness. He said he had never seen Appellant or Valadez before. Rodriguez denied seeing other young men at Adame's house that day, or spiking Adame's beer with methamphetamine, or walking to the store with him to buy more beer. Rodriguez said he was a little drunk that day and did not remember much about it.

---

[2]     At the hospital, Adame evidently tested positive for methamphetamine, although the record does not show whether such evidence was admitted at trial. The prosecutor brought a motion in limine to exclude the test results, unless used for impeachment purposes, such as if Adame eventually admitted to ingesting a significant amount of drugs that day. No such admission was made and no such impeachment followed. However, Adame was asked whether he remembered testifying at Appellant's preliminary hearing that he did not have any drugs that day. He replied that nobody asked him at that time whether Rodriguez had spiked his beer. The reason why Adame tested positive for drugs is not material or dispositive to the issues on appeal.

## E. Analysis of Sufficiency of Evidence

Obviously, the jury heard different versions of the relevant circumstances from different participants. Appellant first focuses on Adame's criminal history and suggests that because of it, he could not have testified truthfully. Even if Adame had tried to be truthful, he had admitted to the jury he was hallucinating around the time of the shooting. Appellant argues this shows his recollections must have been adversely affected and unreliable.

Appellant also points out that Adame changed his story in several respects, such as whether his assailant forced him to snort drugs before shooting him. At trial, Adame denied using a racial slur toward Valadez, but Valadez testified otherwise. Rodriguez's rebuttal testimony failed to support Adame's version that Rodriguez told Adame the names of two of the young men that he argued with and fought. Rodriguez denied putting a drug in Adame's beer, or that they went together to get more beer.

Even in light of such inconsistencies, Appellant has not challenged the adequacy of the jury instructions on how to evaluate the evidence offered at trial. The jurors were instructed that they were to judge the credibility or believability of the witnesses, by using their common sense and experience. (CALCRIM Nos. 226, 301, 302.) They were told that the testimony of only one witness could suffice to prove any fact, in light of all the evidence. The trial judge fully explained how to evaluate previous statements that a witness made, how to judge the effect of a felony conviction, and how to consider testimony from eyewitnesses and experts. (CALCRIM Nos. 315, 316, 318, 332.)

13

It was for the jury to decide which, if any, of the statements of the witnesses it chose to believe. A witness's testimony is not disqualified simply because the jury finds some aspects of that evidence to be untruthful. (*People v. Mincey, supra*, 2 Cal.4th at p. 444.) The jury was given an accurate picture of the participants, from which it could evaluate all the evidence in reaching its conclusions on guilt.

Appellant alternatively argues the evidence was insufficient because there were no other percipient witnesses and no physical evidence that connected him, individually, to the shooting. Even though a gang motive for the crime evidently existed, due to Adame's status as a gang dropout, Appellant looked like some of his relatives who were members. Also, any one of about 100 ESR members around at the time could have done the shooting with such an intent.

The evidence as a whole included Valadez's testimony placing Appellant as one of the young men at the house participating in the crucial confrontation, a few hours before the shooting. The jury heard evidence about Appellant's lifestyle and frequent association with gang members, and it could rationally have accepted the prosecution's theory that Appellant had a gang-related motive to shoot Adame and that he was the one who did so.

The jury heard a lot of background evidence about Adame's credibility or lack thereof. It nevertheless decided to believe his account that he saw Appellant during the verbal confrontation among the three young men, and he recognized Appellant during the shooting. The jury could reasonably have accepted this testimony that Adame

14

remembered what happened, and he was able to identify his attacker and would "never forget that face."

It is not enough for Appellant to argue on appeal that the evidence supports possibilities that the shooter might have been someone else. Together with the showing that a motive existed, and the evidence of a likelihood that Appellant had such an motive, he has not met his burden of showing that his participation in the events before and at the time of the shooting was "physically impossible or inherently improbable." (*Young, supra*, 34 Cal.4th at p. 1181.) On the entire record, sufficient evidence supports the judgment of guilt.

II

*AUTHORITY GOVERNING CHALLENGES TO SENTENCE AS CRUEL AND UNUSUAL PUNISHMENT*

At sentencing, Appellant was 16 years old. His attorney requested the court to refrain from "imposing any sort of life term" as it would constitute "cruel and unusual punishment." Counsel referred to the immaturity of juvenile brains with respect to their decisionmaking abilities, and he spoke about recent legislation that recognized the effect of those factors (possibly referring to the 2012 enactment of § 1170, subd. (d)(2)(A)(i), permitting petitions for recall and resentencing of juvenile offenders who received LWOP sentences).

The court responded that appeals to leniency were misguided, because the Legislature had set forth mandatory sentences that apply to such crimes and enhancements. The court said, "[T]o the extent that any of you think I have any

15

discretion here, I don't, other than [what defense counsel mentioned, recall of LWOP sentences]. And in order for me to do what he and you are suggesting, I would have to conclude that the sentence required by law here is such that it is a de facto life without parole sentence; and it isn't. When he is eligible for parole, he will be in his early 50's. What a waste of a life."

The court ordered that Appellant be "committed to state prison for the term required by law, that's an indeterminate term of life in prison," with a total commitment of 40 years to life (15 years to life for attempted murder; 25 years to life for the enhancements, served consecutively; §§ 664/187, subd. (a); § 12022.53, subd. (d); § 186.22, subd. (b).) The court explained to Appellant that eventually, he would be allowed to apply for parole, although he would no longer be a young man at that point.

A. Issues Presented; Nonhomicide Juvenile Offender Approach

Appellant contends that his mandatory sentence of 40 years to life in prison for this crime, committed while he was a juvenile, amounts to a de facto life sentence that violates the protections of the Eighth Amendment and likewise, article I, section 17 of the California Constitution. In his view, the comments made by the trial court demonstrate that it failed to exercise its existing discretion to consider relevant factors under leading federal and state case law, and we must therefore reverse for resentencing. (*Miller, supra,* 132 S.Ct. 2455; *Graham v. Florida* (2010) 560 U.S. 48, 74 (*Graham*); *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*).)

Appellant disagrees with any contention that section 3051, subdivision (b)(3), which by its terms will provide him with an opportunity to seek a parole hearing after 25

16

years of incarceration, can be construed to supplement or correct a defective sentencing hearing, or to moot any other constitutional problems created at that time. Rather, he argues that under *Graham, supra*, 560 U.S. at page 75, it is the sentencing court that must take all youth-related factors into account "at the outset," and that a hearing 25 years later before a parole board fails to meet that standard. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1386 (*Gutierrez*) [quoting *Graham, supra,* at p. 75, on the issue of when a juvenile offender's incorrigibility, if any, must be evaluated].)

As a backup argument, Appellant claims that even if the sentence does not qualify as a de facto life sentence (e.g., if § 3051, subd. (b)(3) would allow him a parole hearing after 25 years of incarceration, or if a parole hearing becomes available when any § 2933.1 work time credits are applied), the mandatory nature of the 40-years-to-life sentence still violates these constitutional protections and controlling cases. (*Miller, supra*, 132 S.Ct. 2455; *Graham*, *supra*, 560 U.S. 48; *Caballero, supra,* 55 Ca1.4th 262, 268.) Appellant contends the trial court abused its discretion at the sentencing hearing, because those principles and traditional Eighth Amendment analysis indicate that the trial court could take into account his personal youth-related characteristics, but it declined to do so or erroneously believed that it could not do so. (*Gutierrez*, *supra*, 58 Cal.4th 1354, 1391 [a juvenile offender is entitled to the exercise of informed discretion by the sentencing court].) Appellant therefore argues the sentence is disproportionate and unsupported, when all the appropriate factors are considered. (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).)

17

Finally, Appellant makes an equal protection argument based on the statutory treatment of juveniles who were expressly sentenced to LWOP. Under section 1170, subdivision (d)(2)(A)(i), they are entitled to seek recall and resentencing after 15 years of incarceration.[3] Appellant contends that he is similarly situated to juvenile offenders sentenced to LWOP imprisonment, because of the lengthy mandatory sentence he received, and he should receive the benefits of that procedure.

Before addressing the merits of these contentions, we specify that under *Graham*, *supra*, 560 U.S. 48 and *Miller, supra,* 132 S.Ct. 2455, we shall treat the attempted murder conviction before us as a "nonhomicide" offense. In *Caballero, supra*, 55 Cal.4th 262, a case of a juvenile sentenced to a 110-year-to-life prison term for attempted premeditated murders, the court interpreted those federal authorities and held, "sentencing a juvenile offender for a *nonhomicide* offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Caballero*, *supra*, at p. 268; italics added.) The characterization of the offense is not free from doubt, because of the intent to kill found by the jury in its attempted murder verdict. However, we shall assume without deciding that the convictions before us should be viewed as related nonhomicide offenses. (*Id*. at pp. 270-271 (conc. opn. of Werdegar, J.).)

---

3    Section 1170, subdivision (d)(2)(A)(ii) exempts from this recall procedure those juveniles sentenced to LWOP for killings of public safety officials (such as the other defendant in *Gutierrez* (Moffett), or killings involving torture. (*Gutierrez, supra*, 58 Cal.4th at p. 1385.)

A de novo standard of review is applied to the questions of law presented, on whether a punishment is objectively cruel or unusual. (*People v. Em* (2009) 171 Cal.App.4th 964, 971 (*Em*).) In light of the numerous pending cases before the California Supreme Court on the proper interpretations of the holding in *Miller, supra,* 132 S.Ct. at pages 2457 to 2458 (that mandatory LWOP sentences are unconstitutional for juvenile *homicide* offenders; *Alatriste et al, supra.*), we see no useful purpose in setting forth any in depth analysis of the case law that has established current juvenile sentencing parameters. We do, however, outline the bases of those holdings and apply them to this record.

### B. Governing Case Law: Federal

In *Graham, supra,* 560 U.S. 48, 74, the high court decided that it is cruel and unusual punishment to sentence a defendant who committed a *nonhomicide* offense, as a juvenile, to an LWOP term. Under *Graham*, "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime" but it must "give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Id.* at p. 75.)

In *Miller, supra,* 132 S.Ct. 2455, the high court explained how the Eighth Amendment's prohibition on cruel and unusual punishment applies to a defendant who, before reaching 18 years old, committed a homicide. *Miller* disapproved the imposition of mandatory LWOP sentences on juvenile homicide offenders, and held that a sentencing court has the duty to exercise its discretion to consider the juvenile offender's age and youthful characteristics, before it may select a sentence of LWOP. (*Id.* at

19

pp. 2469, 2475.)  Under *Miller,* the factors that a sentencing court must consider before imposing an LWOP sentence on a then-juvenile offender include:  "consideration of his chronological age and its hallmark features -- among them, immaturity, impetuosity, and failure to appreciate risks and consequences . . . taking into account the family and home environment that surrounds him -- and from which he cannot usually extricate himself -- no matter how brutal or dysfunctional."  (*Id.* at p. 2468.)  Likewise, the sentencing court must consider "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him . . . [and] incompetencies associated with youth -- for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys," and "the possibility of rehabilitation . . . ."  (*Ibid.*)

In *Miller* the court explained that both *Roper v. Simmons* (2005) 543 U.S. 551, 575 (*Roper*)[4] and *Graham, supra,* 560 U.S. 48, recognized the crucial issues are whether and when a juvenile offender may be properly deemed incorrigible.  There is admittedly a great difficulty in "distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'  [Citations.]  Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into

---

4    *Roper, supra,* 543 U.S. 551, 575, held that it is cruel and unusual punishment to impose the death penalty on a defendant who committed a capital crime when under the age of 18.

account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 132 S.Ct. at p. 2469.)

## C. Governing Case Law in California

In *Caballero*, *supra*, 55 Cal.4th 262, our Supreme Court analyzed sentencing issues for juvenile *nonhomicide* offenders, and applied the holding in *Graham, supra,* 560 U.S. 48. *Caballero* concluded that a sentence of 110 years to life, imposed on a defendant who was a juvenile when committing nonhomicide crimes, should be treated as a de facto LWOP sentence. There would be no opportunity for such a defendant to be released from prison during his natural lifetime. (*Cabellero, supra,* at p. 268.)

For juvenile homicide offenders, the court in *Gutierrez*, *supra*, 58 Cal.4th 1354, concluded that section 190.5, subdivision (b) (setting the penalty for 16- or 17-year-old juveniles who committed special circumstance murders as LWOP, "or, at the discretion of the court, 25 years to life") should not properly be interpreted as creating a presumption for an LWOP term. Instead, the sentencing court must conduct the discretionary analysis described in *Miller,* of the " 'distinctive attributes of youth,' " in deciding what sentence to impose upon such a juvenile offender. (*Gutierrez, supra,* at pp. 1360-1361.) *Miller* recognizes that children are different from adults, even when they commit terrible crimes or when they are being sentenced to prison. (*Miller, supra,* 132 S.Ct. at p. 2465; *Gutierrez, supra,* at p. 1380.)

Based on these authorities, we next consider Appellant's claims he received a de facto life sentence, or if he did not, his Eighth Amendment rights were nevertheless violated by the manner in which this sentencing took place. (*Gutierrez, supra,* 58 Cal.4th

21

at pp. 1391-1392 [informed discretion required of sentencing court].) We then reach his proportionality analysis on whether the sentence is excessive and he is entitled to resentencing. (*Dillon*, *supra*, 34 Cal.3d 441, 478; pt. IV, *post*.) We can then discuss his equal protection claims. (Pt. V, *post*.)

III

*"DE FACTO" LIFE SENTENCE CLAIMS*

A. Availability of Meaningful Opportunity for Parole

*Miller, supra,* 132 S.Ct. at page 2469 establishes that the prohibition of cruel and unusual punishment precludes the imposition of a *mandatory* LWOP sentence on a juvenile offender. Where nonhomicide juvenile offenders are concerned, *Graham* requires the state courts to give the juvenile offender a realistic parole opportunity to demonstrate maturity and reform. (*Graham, supra*, 560 U.S. at pp. 75, 79, 82.) *Caballero, supra,* 55 Cal.4th at page 268, indicates that not only expressly imposed LWOP sentences, but also aggregate sentences that are functionally equivalent to LWOP, are disallowed, such as where the first parole eligibility date would fall beyond the offender's natural life expectancy.

Although Appellant's aggregate sentence of 40 years to life is otherwise statutorily authorized, he argues it amounts to such an inappropriate de facto, functional LWOP sentence, when viewed in light of his youth at the time of the commission of the offense. This claim of a de facto LWOP sentence has several aspects, which we address in turn. First, what is the appropriate measure for his life expectancy? What are the possible parole eligibility dates he can anticipate, and will they fall within his natural lifetime, to

22

avoid these Eighth Amendment problems?  This requires consideration of whether the provisions of section 3051, subdivision (b) cure or moot any potential unconstitutionality in the proceedings.

## B.  Life Expectancy

The statement in mitigation that Appellant presented to the trial court did not address any statistical methods of estimating life expectancy.  He merely argued he was entitled to an opportunity at parole while he is still young enough to have a life outside of prison.  However, Appellant's opening brief presents new statistical analyses that point out that life expectancy for an incarcerated individual is lower than the life expectancy for a free person.  Specifically, a male California inmate's average life expectancy is around 55-57 years, while an average American male born in 1997, when Appellant was born, can expect to live around 73-76 years.  In the respondent's brief, the attorney general likewise presents actuarial life tables and case authority discussing varying life expectancies.

The initial problem with these arguments is that they are not supported by this record.  In *Caballero* the Supreme Court analyzed life expectancy issues for juvenile offenders who were sentenced to long prison terms, and defined that term as "the normal life expectancy of a healthy person of defendant's age and gender living in the United States." (*Caballero, supra,* 55 Cal.4th at p. 267, fn. 3.)  The federal cases do not yet provide guidance on what constitutes a meaningful opportunity for parole within a lifetime, and the state courts are in the process of addressing those issues. (*Graham, supra*, 560 U.S. at p. 75; *Alatriste et al, supra*.)

23

On de novo review of these sentencing and constitutional issues, we could appropriately consider new authorities if necessary and if properly presented. However, such data are not now before us and it is not necessary to go beyond this record. Other factors, as we next explain, lead us to conclude that Appellant's sentence is not so harsh as to amount to a de facto life sentence without a meaningful opportunity for parole.

Under this developing Eighth Amendment approach, we are required to evaluate the harshness of the challenged sentence, in terms of whether any meaningful opportunities for parole, within the natural lifetime of the juvenile offender, are allowed by it. Only a few juvenile offenders can properly be identified at sentencing as those " 'whose crime reflects irreparable corruption,' " and who must therefore receive the harshest penalty, a true LWOP. (*Gutierrez, supra*, 58 Cal.4th 1354, 1379; *Miller*, *supra*, 132 S.Ct. at p. 2469.)

C. Release Possible after Less than 40-year Term; Work Time Credit Potential

Appellant was first incarcerated at the age of 15, then sentenced at age 16 to a term of 40 years to life in prison. Existing parole provisions would allow his 40-year term to be reduced by credits for work time served, that will enable him to seek parole when he reaches age 49 or 50. (§ 2933.1 [15 percent credit toward sentence is possible].) The trial court appropriately recognized that despite a regrettably long term of future imprisonment, Appellant will still have a decade or two remaining in his normal life expectancy, in which he will be able to seek and possibly obtain release on parole. That fact distinguishes this case from *Caballero* in which it would have been impossible for

24

the defendant to become eligible for parole within his natural life expectancy (110-years-to-life sentence). (*Caballero, supra,* 55 Cal.4th at pp. 265-268.)

We agree with the trial court that Appellant will physically be able to reach eligibility for parole within his natural lifetime, in less than 40 years. Even though he is "exposed" to the possibility of a lifetime in prison, his is not effectively an LWOP sentence. The U.S. Supreme Court in *Graham* and *Miller* stated that the Eighth Amendment issues before it arose only in the context of juvenile offenders who were sentenced to life in prison *without the possibility of parole*. As *Graham* explained, "[a] State is not required to *guarantee* eventual freedom to a juvenile offender convicted of a nonhomicide crime[,]" but "must . . . give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham*, *supra*, 560 U.S. at p. 75, italics added.) Like *Graham*, *Miller* also applies only to "lifetime incarceration without *possibility* of parole." (*Miller*, *supra*, 132 S.Ct. at p. 2475, italics added.) In deciding that Appellant has not been sentenced to "the harshest possible penalty" (see *id.* at p. 2469), either expressly or in a de facto manner, we do not reach the issue of how many years of life expectancy must remain to a defendant after parole eligibility is developed; is one decade or two decades enough? (See *People v. Perez* (2013) 214 Cal.App.4th 49, 58 (*Perez*) ["How much life expectancy must remain at the time of eligibility for parole of course remains a matter for future judicial development . . . ."; italics omitted].) We decide only that Appellant's case falls within existing constitutional parameters of a permissible sentence to be imposed upon a juvenile offender.

In *Perez*, *supra*, 214 Cal.App.4th 49, the court evaluated constitutional challenges to a sentence of 30 years to life that was imposed for nonhomicide crimes the juvenile offender committed at age 16. The court concluded that such a sentence did not offend cruel and unusual punishment prohibitions. The youthful defendant would become eligible for release from prison at age 47, and therefore the court disagreed that his sentence was "a 'functional' or 'de facto' " LWOP sentence, to which *Miller, supra,* 132 S.Ct. 2455, *Graham, supra,* 560 U.S. 48, or *Caballero, supra,* 55 Cal.4th 262 would apply. (*Perez, supra,* at p. 58.) Rather, the court found a meaningful distinction between LWOPs and very long sentences that nevertheless include an eligibility for parole. The court opined that in the latter situations, "there is some meaningful life expectancy left when the offender becomes eligible for parole. We are aware of—and have been cited to—no case which has used the *Roper–Graham–Miller–Caballero* line of jurisprudence to strike down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left at the time of eligibility for parole. [¶] . . . [W]e can safely say that in the case before us there is plenty of time left for Perez to demonstrate, as the *Graham* court put it, 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (*Perez, supra,* at p. 58; note that case was decided in 2013, before the effective date of § 3051 et seq.; see pt. III.D, *post*.)

Even under the sentence as imposed, it remains possible that Appellant will be eligible for parole when he reaches age 49 or 50, before he is very close to the end of his normal life expectancy. (§ 2933.1 [15 percent credit toward sentence is possible].) For

26

these reasons, Eighth Amendment prohibitions were not triggered for this nonhomicide offender, and the sentencing court was not placed under a constitutional obligation to conduct the analysis described in *Miller, supra,* 132 S.Ct. 2455, before imposing this sentence, even as to the mandatory terms.

### D.  Release Possible After 25-year Term; Section 3051, Subdivision (b)

The sentencing in this case was conducted before the effective date of Senate Bill No. 260, which enacted section 3051 and related sections.  (Stats. 2013, ch. 312, § 4, pp. 2660-2662, eff. Jan. 2014.)  With certain exceptions not applicable here, section 3051 provides an opportunity for a juvenile offender to be released on parole irrespective of the sentence imposed by the trial court.  The statute requires the Board of Parole Hearings to conduct "youth offender parole hearings" on a schedule that depends on the length of the defendant's sentence.  As relevant here, youth offender parole hearings are held during the 25th year of incarceration for a prisoner serving a life term of 25 years to life (§ 3051, subd. (b)(3)).

Since Appellant began his incarceration at age 15, it appears that he will be entitled to seek a youth offender parole hearing under section 3051, subdivision (b)(3), when he reaches the age of 40.  He continues to argue that such an administrative type hearing is inadequate, and he was entitled to an exercise of judicial discretion to consider the factors outlined in *Miller, supra,* 132 S.Ct. 2455, in imposing sentence, and at the "outset" of his incarceration.  (*Graham, supra,* 560 U.S. at p. 75.)  He claims that separation of powers principles should prevent the Legislature from interfering with his rights to the exercise of informed discretion by the sentencing court, by enacting such a

27

statute that may replace it. (*Gutierrez*, *supra*, 58 Cal.4th at p. 1391 [informed discretion requirement].)

In *Gutierrez* the court was considering a statutory issue, whether a presumption under section 190.5, subdivision (b) should govern the imposition of LWOP sentences on juvenile homicide offenders. (*Gutierrez, supra*, 58 Cal.4th at pp. 1385-1387.) Although the Legislature had addressed a similar problem by enacting section 1170, subdivision (d)(2), to provide eventual relief to some such offenders, the court ruled that the LWOP sentences before it had been incorrectly imposed under a belief that the presumption set forth in section 190.5, subdivision (b) required that sentence, and the court disapproved previous mistaken case law. (*Gutierrez, supra,* at pp. 1386-1387.) Because those juvenile offenders were exposed to the harshest possible penalties under section 190.5, subdivision (b), the high court decided that they could not be imposed without a judicial exercise of allowable discretion under *Miller, supra*, 132 S.Ct. 2455, together with the applicable statutory provisions (§ 190.5, subd. (b); *Gutierrez, supra*, at pp. 1390-1391.) That is not this case, because Appellant's current sentence still allows for a meaningful opportunity for parole within his natural life time, which does not amount to the harshest possible penalty that would trigger such a *Miller* inquiry.

Unlike the sentence in *Caballero, supra*, 55 Cal.4th 262, of 110 years to life, the sentencing court did not impose such a lengthy sentence as to impliedly preclude Appellant from ever becoming eligible for parole. (*Id.* at p. 268.) No judgment has been made, expressly or impliedly by the number of years imposed, that Appellant can never

be released on parole. His sentence is subject to statutory parole provisions that will become available within his natural life expectancy.

E. Comparison: Administrative Parole System versus Initial Judicial Sentencing

Appellant further argues there is no assurance that current parole provisions will not be repealed or replaced in the future, and therefore they cannot be viewed as a potential solution to his claims of unconstitutionality of his sentence. He relies on the discussion in *Gutierrez, supra*, 58 Cal.4th 1354, concerning the invalidity of a mandatory, nondiscretionary LWOP sentence imposed on a juvenile homicide offender. There, the court said the identified constitutional problem, the omission of LWOP sentencing discretion concerning a juvenile offender, could not be remedied by the application of a statute that allows a potential mechanism for recall and resentencing after 15 to 24 years (in that case, § 1170, subd. (d)(2) [to allow LWOP sentences imposed on juveniles to be recalled and corrected]). (*Gutierrez, supra,* at pp. 1384-1387.)

In *Gutierrez,* the court explained: "*Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to—not as an after-the-fact corrective for—'making the judgment at the outset that those offenders never will be fit to reenter society.' [Citation.] . . . Neither *Miller*[, *supra*, 132 S.Ct. at p. 2469] nor *Graham*[, *supra*, 560 U.S. at p. 75] indicated that an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that sentence and its underlying judgment of the offender's incorrigibility 'at the outset.' " (*Gutierrez, supra,* 58 Cal.4th at p. 1386; italics omitted.)

29

Although Appellant claims that such a statutory remedy, a future youth offender parole hearing (§ 3051, subd. (b)(3)), is insufficient to protect his Eighth Amendment rights, he cannot make such a showing unless the initial lengthy sentence he received was imposed defectively, i.e., without essential consideration of the *Miller* factors. However, he cannot show that the court imposed such a lengthy term as would prevent his becoming eligible for parole within his natural lifetime and that would accordingly invoke the *Miller* rubric. He is not in the position of a juvenile offender who was entitled to the exercise of judicial discretion in sentencing under *Miller, supra,* 132 S.Ct. 2455, before the selection of any LWOP term. Moreover, we cannot speculate that he will incur prejudice in the future, due to any possibility that some relevant evidence about his youthful characteristics may become unavailable at a future parole hearing. The point is that he is not entitled to recall and judicial resentencing, because the sentence imposed was not unlawful.[5]

Since Appellant does not have an LWOP sentence, section 3051, subdivision (b) provisions will become available to him. (See § 3051, subd. (h) [the procedures in § 3051, subd. (b) are inapplicable to LWOP sentences].) Under section 3051, subdivision (g), an offender may seek a subsequent hearing, if initial applications for parole are denied. Whatever potential release dates may eventually apply for Appellant, pursuant to statute and the circumstances of this case, they appear to fall within his natural lifetime,

---

[5]    In his reply brief, Appellant cites to *People v. Hernandez* (S224383), in which a petition for review was granted on April 1, 2015. Further action in that case was deferred pending consideration and disposition of *Alatriste et al.*

30

and to comport with due process requirements.  Eighth Amendment protections were not triggered by the manner in which this sentence was imposed.

IV

*CLAIMS AGAINST SENTENCE THAT IS LENGTHY BUT NOT "DE FACTO LWOP"*

A.  Was Sentence Incorrectly Imposed?

Appellant next argues that the trial court failed to understand that it retained some degree of discretion in sentencing, and that *Miller* would authorize such an inquiry in his case.  He contends the mandatory sentence of 40 years to life, even if not a de facto life term, offends constitutional principles, because in the exercise of an informed discretion, a sentencing court must " 'take into account how children are different.' "  (*Gutierrez*, *supra*, 58 Cal.4th at p. 1390.)  The factors identified in *Miller, supra,* 132 S.Ct. 2455, pertain to the " 'distinctive attributes of youth,' " as they affect culpability and punishment for homicide, and presumably for other offenses.  (*Gutierrez, supra*, at pp. 1360-1361.)

Appellant's argument that the sentencing court had inherent discretion and the duty to consider the *Miller* factors may be based on the high court's language in *Graham*, to the effect that juvenile offenders must have "a 'meaningful opportunity to obtain release' as a constitutionally required alternative to—not as an after-the-fact corrective for— 'making the judgment *at the outset* that those offenders never will be fit to reenter society.' "  (*Gutierrez*, *supra*, 58 Cal.4th at p. 1386; italics omitted.)  *Miller* prohibits imposing the harshest of prison sentences (LWOP) as a mandatory scheme, and it thus requires some discretion to be exercised by the trial court in sentencing.  (*Miller, supra,* 132 S.Ct. at p. 2469.)

31

We disagree that the mandatory nature of Appellant's sentence, alone, requires that the Eighth Amendment prohibitions apply. A sentence of 40 years to life may eventually become a true life sentence, but not in every case, because of any available credits and parole opportunities. The length of the terms required by statute did not add up to such a mandatory time period of incarceration as to place all parole opportunities beyond Appellant's normal lifespan, even when his age at the time of the commission of the offense is taken into account. (§§ 664/187, subd. (a); 12022.53, subd. (d).)

The court at sentencing was made aware of relevant youth-related factors about Appellant. It was not making an express or implied determination that Appellant was incorrigible and would never be entitled to be released. His exposure to a potential life term was not of the magnitude that required a discretionary evaluation, at sentencing, of the factors that would potentially justify imposition of the harshest possible punishment under *Miller*. Appellant has no basis to claim that the trial court omitted to exercise required discretion in imposing the sentence. (*Gutierrez, supra,* 58 Cal.4th at pp. 1379, 1391.)

## B. Is Sentence Disproportionate to the Crime?

Appellant next describes his sentence as disproportionate in light of earlier authorities arising out of cruel or unusual punishment prohibitions, such as *Dillon*, *supra*, 34 Cal.3d 441, 478 and *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*). These cases stand for the proposition that a punishment violates the California Constitution where it is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Ibid.; People v. Carmony* (2005) 127

32

Cal.App.4th 1066, 1085.) To show a sentence is relatively cruel or unusual under that disproportionality approach, comparisons are required of "(1) the nature of the offense and the defendant's background, (2) the punishment for more serious offenses, or (3) punishment for similar offenses in other jurisdictions." (*In re Nunez* (2009) 173 Cal.App.4th 709, 725.)

In *Graham*, *supra*, 560 U.S. at pages 59 to 60, the Supreme Court acknowledged the Eighth Amendment has a " 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' " Also, in "determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime, [a] court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.] '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." (*Graham*, *supra*, 560 U.S. at p. 60.) "The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." (*Lockyer v. Andrade* (2003) 538 U.S. 63, 77.)

In the disproportionality analysis factor that considers a defendant's background, youth is a valid consideration. (*Graham*, *supra*, 560 U.S. at pp. 60-61; *Dillon, supra*, 34

Cal.3d at p. 479 [identifying factors such as a defendant's "age, prior criminality, personal characteristics, and state of mind"].) However, "Successful challenges based on the traditional *Lynch–Dillon* line are extremely rare." (*Perez, supra*, 214 Cal.App.4th 49, 60.) In *Perez*, the court rejected an argument by the 16-year-old defendant that his sentence of 30 years to life, for forcible sex offenses, must be reduced under basic Eighth Amendment principles. The court declined to rule that his sentence was unconstitutional or grossly disproportionate. (*Perez, supra*, at pp. 57-58.) The court deemed it significant that Perez would become eligible for parole by age 47, and thus his sentence was not among the "most severe" of penalties that would amount to de facto LWOP imprisonment or be disproportionate to the offense.

Appellant attempts to distinguish *Perez, supra*, 214 Cal.App.4th 49, saying it wrongly failed to acknowledge that under *Graham, supra,* 560 U.S. 48 and *Miller*, the courts recognize that juveniles are fundamentally different from adults and should be treated differently than adults, for purposes of imposing punishment. (See *Miller, supra*, 132 S.Ct. at p. 2470.) However, in neither Perez's case nor in this case were the outer limits imposed by *Miller* on punishment violated. The sentences imposed in each instance still allowed the juvenile offenders to have future meaningful opportunities to seek parole, within a natural lifetime. (*Id*. at p. 2469.)

Appellant next relies on evidence about his personal characteristics to say that the lengthy sentence is not roughly proportionate to his culpability. He points to the record showing that many of his immediate and extended family members were ESR-affiliated, and that his "prior criminal record was relatively benign considering the familial and peer

pressures at play. Prior to the instant offense, he had not been convicted in adult court, or adjudicated guilty in juvenile court, of any prior crimes." He told the probation officer before sentencing that he was not gang affiliated.

This proportionality argument by Appellant does not adequately address "the nature of the offense" as well as his background, nor does it analyze other relevant factors (punishment for more serious offenses, compared to punishment for similar offenses in other jurisdictions). (*In re Nunez*, *supra*, 173 Cal.App.4th 709, 725.) Attempted murder is a serious and dangerous crime, and we cannot say the sentence imposed was grossly disproportionate. Appellant has not shown the circumstances of the offense or of his background were so unusual and mitigating that the statutorily mandated sentence is unconstitutional. His sentence does not represent an Eighth Amendment constitutional violation.

V

*EQUAL PROTECTION CLAIMS*

A. Issues Presented

Both federal and state constitutional provisions protect the right to equal protection of law. " ' " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " ' " (*People v. Jeha* (2010) 187

35

Cal.App.4th 1063, 1073, italics omitted; *People v. McKee* (2010) 47 Cal.4th 1172, 1218-1219.)

Appellant seeks to have us construe section 1170, subdivision (d)(2)(A)(i) in a manner that would extend its terms to his situation, based on a strict scrutiny analysis. Doing so might give him an earlier opportunity to seek parole (after 15 years) than that to which he would otherwise be entitled. (See *Gutierrez, supra,* 58 Ca1.4th 1354, 1373 [if a " ' "statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable" ' "].)

Section 1170, subdivision (d)(2)(A)(i) allows those juvenile offenders who were sentenced to LWOP (but see fn. 3, *ante*, for exceptions), to seek recall and resentencing after 15 years of incarceration: "When a defendant who was under 18 years of age at the time of the commission of the offense *for which the defendant was sentenced to imprisonment for life without the possibility of parole* has served at least 15 years of that sentence, the defendant may submit to the sentencing court a petition for recall and resentencing." (§ 1170, subd. (d)(2)(A)(i); italics added.)

Appellant compares section 1170, subdivision (d)(2)(A)(i) to the parole provision that will presumably apply to his case (i.e., § 3051, subd. (b)(3)), and suggests: "[B]oth provisions were enacted in response to evolving Eighth Amendment jurisprudence . . . ,"

36

and therefore the aim of both sections is to give those juvenile offenders who were sentenced to life some opportunity to obtain release, by showing they have matured and changed. His arguments are again premised on the contention that he received a de facto LWOP sentence.

Appellant thus argues that the terms of section 1170, subdivision (d)(2)(A)(i), as they are written, infringe upon a fundamental right, his liberty interest. In such a case, "the state bears the burden of establishing not only that it has a compelling interest which justifies the law, but that the distinctions drawn by the law are necessary to further its purpose." (*People v. Olivas* (1976) 17 Cal.3d 236, 243 (*Olivas*); italics omitted.) Appellant argues that the statutory scheme impermissibly allows for disparate limitations on parole and/or resentencing opportunities for different classes of life-sentenced juvenile offenders, and states in his brief as follows: "Assuming strict scrutiny applies, respondent cannot sustain its burden of establishing a compelling state interest to exclude from the purview of section 1170, subdivision (d)(2) those juveniles who are sentenced for arguably less serious crimes to indeterminate life sentences *with* the possibility of parole." (Original italics.)

Appellant further argues that even if the alternative "rational relationship" test for equal protection analysis applies, the difference in treatment between these two categories of juvenile offenders should not survive scrutiny under the equal protection clause, in light of the similarity between the statutory purposes of section 1170, subdivision (d) and section 3051, subdivision (b).

## B. Analysis

To evaluate these arguments, we apply rules of statutory interpretation for resolving questions of law, on de novo review. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 76-77.) We seek to ascertain and carry out the Legislature's intent, by looking first to the words of the statute and giving them the usual and ordinary meaning. (Code Civ. Proc., § 1859; *People v. Garcia* (2002) 28 Cal.4th 1166, 1172.) In case of ambiguity in the text of the statute, we resort to its legislative history. (*Gutierrez, supra*, 58 Cal.4th at p. 1369.)

We have already discussed above the reasons why we cannot accept Appellant's contention that he received a sentence that is a de facto or "functional" equivalent to an LWOP sentence. (Pt. III.C, *ante*.) Also with respect to his equal protection arguments, the plain language of section 1170, subdivision (d)(2)(A)(i) does not support his claim that he is entitled to the benefits described within it. The statutory language does not suggest that the Legislature intended for its provisions, which provide a specific remedy to the population of juvenile offenders who were expressly given LWOP terms, also to become applicable to other types of sentences not mentioned (e.g., "de facto" equivalents of LWOP). If the Legislature had intended that result, it could have so provided. It is not "the province of this court to rewrite the statute to imply an intent left unexpressed [by the Legislature.] . . . The courts may not speculate that the Legislature meant something other than what it said. Nor may they rewrite a statute to make it express an intention not expressed therein." (*Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 412.)

38

As already explained, Appellant's sentence, even considering its mandatory terms before parole eligibility, will be administered under applicable parole provisions. Section 3051, subdivision (b)(3) will provide him with parole eligibility after 25 years of incarceration. Alternatively, section 2933.1 may provide him with parole eligibility at a later time. In either case, the sentence imposed will not preclude him from having an opportunity to seek parole within his natural lifespan.

Although section 1170, subdivision (d)(2)(A)(i) and section 3051, subdivision (b) arose out of similar policy concerns, their purposes address differently situated prisoners who were juvenile offenders. (*Olivas*, *supra*, 17 Cal.3d 236, 243.) We are not free to add to the language of these sections or to construe them to apply to situations outside of their stated scope. (*Mutual Life Ins. Co. v. City of Los Angeles, supra*, 50 Cal.3d 402, 412.) We apply the law as it now stands, and do not speculate on whether those provisions may be changed in the future.

Appellant's sentence, even though lengthy, does not have the main characteristic of an LWOP sentence, i.e., that it would preclude him from any opportunity to seek parole within his natural lifespan. He does not show that he is similarly situated to offenders sentenced to LWOP, for purposes of the law challenged, section 1170, subdivision (d)(2)(A)(i). (*People v. McKee*, *supra*, 47 Cal.4th 1172, 1218-1219.) We again reject his argument that any remedies he may have under section 3051, subdivision (b) or section 2933.1 are inadequate because they will involve administrative action. The initial judicial sentencing that he received does not offend the Eighth Amendment or equal protection principles.

39

DISPOSITION

The judgment is affirmed.


                                                    HUFFMAN, Acting P. J.

WE CONCUR:


        NARES, J.


        McDONALD, J.


40